UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
LUIS TORREGROSA,

                Plaintiff,

-against-

CAROLYN W. COLVIN, ACTING
COMMISSIONER OF SOCIAL SECUIRTY,

                Defendant.
---------------------------------------------------------x

**MEMORANDUM AND ORDER**
15-CV-2257 (RRM)

ROSLYNN R. MAUSKOPF, United States District Judge.

Plaintiff Luis Torregrosa brings this action against defendant Carolyn Colvin, Acting Commissioner of the Social Security Administration (the "Commissioner"), pursuant to 42 U.S.C. §§ 423(d)(1), (3), (5), seeking review of the Commissioner's determination that Torregrosa is not entitled to Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. Torregrosa maintains that the Commissioner's determination is not supported by substantial evidence and is contrary to law. (Pl.'s Mem. (Doc. No. 18) at 16–17.) Both Torregrosa and the Commissioner have moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure ("Rule") 12(c). (Def.'s Mem. (Doc. No. 16); Pl.'s Mem.) For the reasons set forth below, Torregrosa's motion is denied and the Commissioner's motion is granted.

## BACKGROUND

### I. Procedural History

Torregrosa filed an application for DIB on June 20, 2012, (Admin. R. (Doc. No. 20) at 120)[1] alleging disability as of December 20, 2011, due to diabetes, dislocated shoulder

---

[1] For ease of reference, citations to the Administrative Record utilize the Electronic Case Filing System ("ECF") pagination.

ligaments, an inflamed prostate, and pain in his joints, back, and knees, (*Id.* at 98–105, 124). The application was denied on September 21, 2012. (*Id.* at 57–60.) On October 2, 2012, Torregrosa requested a hearing before an Administrative Law Judge ("ALJ") to review his application. (*Id.* at 61–62.) On October 3, 2013, ALJ Alan B. Berkowitz held a hearing, at which Torregrosa, his wife Lucilla Torregrosa, and vocational expert Christina Boardman testified without counsel. (*Id.* at 10.) On December 6, 2013, ALJ Berkowitz decided that Torregrosa did not qualify for DIB because, while he could no longer perform any past-relevant work, (*id.* at 49), Torregrosa was able to perform light work as defined in 20 C.F.R. § 404.1567(b). (*Id.* at 47.) On January 15, 2014, Torregrosa requested review of the ALJ's decision by the Social Security Appeals Council. (*Id.* at 5–7.) On March 20, 2015, the Appeals Counsel denied Torregrosa's request for review. (*Id.*) On April 15, 2015, Torregrosa commenced this action. (*Id.* 5–7; Compl. (Doc. No. 1).)

## II. Administrative Record

### a. Non-Medical Evidence

Torregrosa was born on August 4, 1965. (Admin. R. at 50.) He completed high school in Puerto Rico and can understand, speak, and read English. (*Id.* at 16, 36, 125.) At the time of the ALJ hearing, Torregrosa lived in an apartment with his wife and three children. (*Id.* at 15–16, 141.) On a typical day, he would prepare meals, go on two walks, and watch TV. (*Id.* at 137–38.) He also indicated that he could count change, manage a savings account, and go grocery shopping once a week, but could not handle paying his bills. (*Id.*)

Torregrosa worked as a real estate broker from 2005 to 2011 and a truck driver from 1992 to 2007, earning approximately $29,000 per year. (*Id.* at 15, 27, 28, 49, 125.) As a truck driver, Torregrosa would drive to New Jersey and Connecticut, load the truck, fix and lift

machines, and deliver plant equipment and syrup for a pizzeria and a beverage company. (*Id.* at 29.) The heaviest thing he had picked up for work was a boiler. (*Id.* at 20.) During 2011 and 2012, he was self-employed and earning approximately $9,000 annually by picking up cans and scratch metal. (*Id.* at 19–20.)

Torregrosa reported that since December 20, 2011, he could not squat, lift any heavy objects, stand or sit for a long time, or do house and yard work. (*Id.* at 135–36, 138.) He could not drive a truck or load and unload equipment as he used to do. (*Id.* at 140.) He could walk for only about thirty minutes and required a five-minute break every fifteen minutes. (*Id.* at 134–36.) He struggles to climb stairs, kneel, reach, and use his hands. (*Id.* at 135.) Torregrosa represented that he requires assistance taking a shower and injecting insulin. (*Id.* at 139.) His sleep has been affected by constant pain in his shoulders and the need to urinate every hour. (*Id.* at 140.)

In the July 6, 2012 disability report filed in connection with this appeal, Torregrosa alleged that he has been disabled since December 20, 2011. (*Id.* at 124.) He indicated that he has diabetes, dislocated shoulder ligaments, an inflamed prostate, and pain in his joints, back, and knees. (*Id.*) On October 3, 2013, Torregrosa testified before the ALJ that he has memory loss, damage in both shoulders, swollen knees, and back pains. (*Id.* at 21–23.) These pains occurred approximately four times per week and occasionally kept him in bed all day. (*Id.* at 23.) He further testified that he could stand for ten or fifteen minutes, walk two blocks non-stop, sit about forty-five minutes, lift up his arms and shoulders for two or three seconds, and lift at most twelve to fifteen pounds. (*Id.* at 24.) Torregrosa's wife testified that due to his considerable pain, Torregrosa had not worked since 2012. (*Id.* at 34–35.)

b. **Medical Evidence Prior to December 20, 2011**

i. **Wyckoff Heights Medical Center**

From March 2008 to December 2011, Torregrosa repeatedly visited the Emergency Room of Wyckoff Heights Medical Center. (*Id.* at 360–68.) On March 8, 2008, Torregrosa complained of pain on the right side of his face. (*Id.* at 360.) He was diagnosed with a toothache. (*Id.*) On July 27, 2010, Torregrosa was diagnosed with a shoulder sprain and strain contusion at pain scale ten, the worst possible pain. (*Id.* at 365–68). There was no swelling. (*Id.* at 364.) On May 9, 2011, Torregrosa went to the Emergency Room for a "sudden onset of [sic] severe [sic] colicky pain in [his] left flank." (*Id.* at 343, 346, 351.) Torregrosa was diagnosed as having small non-obstructing kidney stones and was discharged on May 11, 2011. (*Id.* at 342.)

ii. **Damadian MRI in Canarsie, P.C.**

On April 12, 2011, a magnetic resonance imaging ("MRI") scan revealed a tear in Torregrosa's right shoulder. Specifically, the MRI showed a full thickness tear of the musculotendinous junction supraspinatus tendon with a 2x2 centimeter tendon gap without tendon restriction. (*Id.* at 171, 216, 264.)[2]

c. **Medical Evidence after December 20, 2011**

i. **Wyckoff Heights Medical Center (June 6, 2012 – June 11, 2012)**

Torregrosa was hospitalized at Wyckoff Heights Medical Center for three weeks, complaining of dehydration with nausea and increased frequency of urination. (*Id.* at 210, 284.) A radiology report of Torregrosa's chest did not show any evidence of pulmonary infiltration or consolidation. (*Id.* at 179, 325.) A June 7, 2012 report showed that Torregrosa had normal sensations, normal range of motion, no tenderness, and no swelling. (*Id.* at 197.) He also had

---

[2] Torregrosa underwent surgery to repair this tear in December, 2012. *See* Section II (b)(iv), *infra*.

4

joint pain in his right shoulder rotator cuff. (*Id.* at 195.) Furthermore, in a consultant's opinion dated June 8, 2012, Dr. Stella Ilyayeva indicated that Torregrosa had recently used cocaine and occasionally drank alcohol. (*Id.* at 188.) He was diagnosed with new onset type II diabetes. (*Id.* at 190, 320.)

A June 11, 2011 discharge summary indicated that the primary diagnosis was new onset diabetes with the secondary diagnosis of morbid obesity. (*Id.* at 269.) Torregrosa had no pain and had ambulatory functional status. (*Id.* at 270.) He had a good response to hospital treatment and denied urinary frequency and dry mouth on the day of discharge. (*Id.* at 273.) He was advised to follow up with a nutritionist, a primary medical doctor, and an endocrinologist in three-to-five days. (*Id.*)

        ii.        **Dr. Vinod Thukral, M.D., Treating Physician (September 12, 2012)**

In an internal medicine examination report, Dr. Vinod Thukral indicated that Torregrosa complained of shoulder pain, knee pain, diabetes, decreased visual acuity, and proteinuria. (*Id.* at 218.) The report indicated that Torregrosa could cook, clean, do laundry, and shop as needed. (*Id.* at 219.) Dr. Thukral indicated that Torregrosa denied any drug, alcohol or substance abuse. (*Id.*) Torregrosa generally appeared to be able to walk on heels and toes without difficulty, squat fully, stand normally, and change clothes without help. (*Id.*) He demonstrated full range of movement with his elbows, forearms, wrists, left shoulder, hips, knees, and ankles. (*Id.*) The examination on his right shoulder showed moderate tenderness on movement. (*Id.*) His forward elevation and abduction were both limited to ninety degrees. (*Id.*) With the exception of his right shoulder, he had stable joints. (*Id.*) The examination showed that Torregrosa could sit or stand, but had a moderate limitation in pulling, pushing, lifting, or carrying due to joint pain. (*Id.* at 221.) By Torregrosa's medical history, Dr. Thukral diagnosed

5

diabetes, decreased visual acuity, proteinuria, bilateral knee pain, and bilateral shoulder pain. (*Id.*) Dr. Thukral advised Torregrosa to see his primary care physician for elevated blood pressure immediately upon leaving the medical center. (*Id.* at 219, 222.) Torregrosa was also advised to see an ophthalmologist for decreased visual acuity in his left eye. (*Id.* at 219.)

### iii. C. Williams, Medical Consultant (September 21, 2012)

On September 21, 2012, Torregrosa went through a physical residual functional capacity assessment. (*Id.* at 223–228.) The assessment report revealed that he could occasionally carry or lift up to ten pounds. (*Id.* at 224.) Medical Consultant Williams found that Torregrosa could walk, stand, or sit with normal breaks for six hours in an eight-hour workday. (*Id.*) His push or pull capacity was limited in his upper extremities. (*Id.*) He could only occasionally climb or crawl due to his right shoulder impairment, and was limited in all directions. (*Id.* at 225.) The primary diagnosis was right shoulder joint effusion with a tendon gap, and the secondary diagnosis was type II diabetes. (*Id.* at 223.) In a case analysis report dated November 15, 2012, Dr. R. Mitgang reviewed and agreed with the September 21, 2012 assessment report. (*Id.* at 230.)

### iv. Beth Israel Medical Center (December 2012)

Dr. Catherine Compito performed rotator cuff surgery on Torregrosa's right shoulder. (*Id.* at 369–70.) Dr. Compito prescribed anti-inflammatory and pain management drugs, and instructed Torregrosa to keep his arm in a sling for six weeks. (*Id.*)

### v. Dr. Ko Latt, M.D., Internal Medicine (June 22, 2013)

On June 22, 2013, Dr. Ko Latt reviewed Torregrosa's ability to perform work-related activities. (*Id.* at 256–61.) Dr. Latt concluded that Torregrosa could lift or carry up to ten

pounds "occasionally," but could never lift more than eleven pounds.[3] (*Id.* at 256.) Dr. Latt found that Torregrosa could sit for eight hours, stand for six hours, and walk for two hours during an eight-hour workday. (*Id.* at 257.) Dr. Latt found Torregrosa had a limited range of movement in his right shoulder due to pain and tenderness. (*Id.*) Regarding Torregrosa's use of hands and feet, Dr. Latt indicated that Torregrosa's right hand could reach, push and pull occasionally, finger "frequently,"[4] and feel "continuously."[5] His left hand could reach, push and pull frequently, and handle, finger, and feel continuously. (*Id.* at 258.) He could control both feet continuously. (*Id.*) Torregrosa complained of pain in both shoulders. (*Id.*)

Torregrosa could climb stairs, ramps, ladders, or scaffolds, and balance, stoop, kneel, crouch, or crawl occasionally. (*Id.* at 259.) No impairment affected Torregrosa's hearing or vision. (*Id.*) Torregrosa could continuously tolerate humidity, wetness, dust, odors, fumes, moderate office noise, and pulmonary irritants. (*Id.* at 260.) He could also occasionally tolerate unprotected heights, and extreme cold and heat. While Torregrosa could operate a motor vehicle, he could never move mechanical parts or tolerate vibrations. (*Id.*)

Dr. Latt assessed that Torregrosa could shop, travel, or ambulate without assistance, walk a block at a reasonable pace on an uneven surface, use standard public transportation, prepare simple meals, care for his personal hygiene, and handle files. (*Id.* at 261.) Dr. Latt noted that the right rotator cuff surgery still caused Torregrosa pain and limited his range of movement. (*Id.*) Dr. Latt expected these limitations would last for twelve months. (*Id.*)

---

[3] For purposes of this matter, "occasionally" here means very little to one-third of time. (*Id.* at 256.)

[4] For purposes of this matter, "frequently" means from one-third to two-thirds of the time. (*Id.* at 257.)

[5] For purposes of this matter, "continuously" means more than two-thirds of the time. (*Id.*)

7

####### vi. Wyckoff Heights Medical Center (June 25, 2013)

On June 25, 2013, Torregrosa was hospitalized after a garage door fell on his post-surgical right shoulder. (*Id.* at 267.) Physical examination showed no swelling, but pain with forward flexion, abduction and internal rotation, and acromioclavicular joint tenderness on the right shoulder. (*Id.*)

#### d. Medical Evidence Submitted to the Appeals Council

##### i. The Brooklyn Hospital Center (July 14, 2014)

A radiology report indicated that on July 14, 2014, Torregrosa had underwent a computed tomography scan on his lumbar spine. (*Id.* at 372.) The scan revealed mild dextroscoliosis[6] and grade 1 anterolisthesis of L4 on L5, a sclerotic focus within the L3 vertebral body with a speckled appearance suggestive of a hemangioma, moderate degenerative endplate osteophytes at multiple lumbar levels, and moderate intervertebral disc space narrowing at L5/S1 with milder intervertebral disc space narrowing at additional lumbar levels. (*Id.*) The scan also found a partially calcified moderate disc bulge without significant central canal stenosis at L5/S1, and a mild disc bulge combined with facet or flavum hypertrophy, which contributes to mild central canal stenosis and moderate-severe right and left neural foraminal narrowing. (*Id.*) The final report suggested obtaining an MRI for further evaluation. (*Id.*)

##### ii. Wyckoff Heights Medical Center (September 21, 2014)

In September 2014, Torregrosa was hospitalized for acute pancreatitis and uncontrolled diabetes. (*Id.* at 373.) An abdominal ultrasound and a computerized tomography scan of Torregrosa's abdomen and pelvis revealed mild diffuse fatty infiltration of the liver, minimal basilar posterior pleural thickening or atelectasis in his lung, and mild multilevel degenerative

---

[6] Dextroscoliosis means scoliosis of the spine with a curvature of the spine to the right.

changes of the spine. (*Id.* at 374–76.) Dr. Iasmina Jivanov, M.D., suggested further evaluation with ultrasonography on Torregrosa's gallbladder. (*Id.* at 375.) Dr. Jivanov also noted Torregrosa's acute pancreatitis, headache, morbid obesity, and uncontrolled diabetes. (*Id.* at 373.)

    e.    **Vocational Expert Evidence**

Christina Boardman testified as a vocational expert ("VE") at Torregrosa's hearing. (*Id.* at 9, 26, 28.) The VE first asked the ALJ to clarify the substance of Torregrosa's work as a real estate broker and a truck driver. (*Id.* at 26–28.) After the ALJ's reexamination of Torregrosa, the VE classified Torregrosa's job as a truck driver under the title of route truck delivery driver (DOT Code No. 292.353-010),[7] which requires medium strength. (*Id.* at 29.) The ALJ further asked the VE a hypothetical as to whether an individual, with the same age, educational background, and work history as Torregrosa, would be able to perform this past work using light strength. (*Id.* at 30.) Although the VE answered that such an individual could not perform the same past work as Torregrosa did, she provided examples of what jobs the individual could perform, such as a ticket taker (DOT Code No. 344.667-010) with an estimated 106,860 jobs in the national economy for those with light strength, and a mail clerk (DOT Code No. 209.687-026) with an estimated 102,410 jobs in the national economy. (*Id.* at 30–31.) However, after considering the additional limitation of being able to only occasionally reach overhead, the VE testified that such an individual could not work as a ticket taker. (*Id.*) That said, an individual with this additional limitation could work as an order caller (DOT Code No. 209.667-014) with an estimated 2,808,100 jobs in the national economy. (*Id.*)

---

[7] The "DOT" numbers refer to the corresponding occupation code in the U.S. Department of Labor, *Dictionary of Occupational Titles* (4th ed., rev'd 1991), *available at* www.oalj.dol.gov/libdot.htm.

9

The ALJ further inquired about job options for an individual with occasional reaching instead of just occasional overhead reaching. (*Id.* at 31.) The VE provided three examples of work such a person could perform: (1) an usher (DOT Code No. 344.677-014) with an estimated 106,860 jobs in the national economy; (2) a counter clerk (DOT Code No. 249.366-010) with an estimated 432,650 jobs in the national economy; and (3) an inspector of surgical instruments (DOT Code No. 712.684-050) with an estimated 454,010 jobs in the national economy. (*Id.* at 31.)

Then, under a third hypothetical, the ALJ asked about job options for a sedentary individual with occasional overhead reaching. (*Id.* at 32.) The VE provided another three examples: (1) an order clerk (DOT Code No. 209.567-014) with an estimated 208,800 jobs nationwide; (2) an addresser (DOT Code No. 209. 587-010) with an estimated 96,560 jobs nationwide; and (3) a table worker in a factory setting (DOT Code No. 739.687-082) with an estimated 454,010 jobs nationwide. (*Id.*) Finally, under a fourth hypothetical, the VE testified that there were no jobs in the national economy that a sedentary individual without any ability to reach could perform. (*Id.*)

## STANDARD OF REVIEW

### I. Review of Denial of Social Security Benefits

When reviewing the final determination of the Commissioner, the Court does not make an independent determination about whether a claimant is disabled. *See Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Rather, the Court "may set aside the Commissioner's determination that a claimant is not disabled only if the [ALJ's] factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)). "'[S]ubstantial evidence' is

'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"In determining whether the agency's findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." (*Id.*) (internal quotation marks omitted). "If there is substantial evidence in the record to support the Commissioner's factual findings, they are conclusive and must be upheld." *Stemmerman v. Colvin*, No. 13-CV-241 (SLT), 2014 WL 4161964, at *6 (E.D.N.Y. Aug. 19, 2014) (citing 42 U.S.C. § 405(g)). "This deferential standard of review does not apply, however, to the ALJ's legal conclusions." *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 342 (E.D.N.Y. 2010). Rather, "[w]here an error of law has been made that might have affected the disposition of the case . . . [an ALJ's] failure to apply the correct legal standards is grounds for reversal." (*Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted).)

## II. Eligibility Standard for Disability Insurance Benefits

To establish eligibility for DIB, an applicant must produce medical and other evidence of his disability. *See* 42 U.S.C. § 423(d)(5)(A). To be found disabled, the claimant must have been unable to work due to a physical or mental impairment resulting from "anatomical, physiological, or psychological abnormalities, which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(1)(A). This impairment must have lasted or be expected to last for a continuous period of not less that twelve months. *Id.*; *see also Barnhart v. Walton*, 535 U.S. 212 (2002). Further, the applicant's medically determinable impairment must have been of such severity that he is unable to do his previous work or,

considering his age, education, and work experience, he could not have engaged in any other kind of substantial gainful work that exists in the national economy. *See* 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, the Commissioner engages in the following five-step analsyis:

> [1] First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.
>
> [2] If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.
>
> [3] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him *per se* disabled.
>
> [4] Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.
>
> [5] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d Cir. 1998)); *see also Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); 20 C.F.R. § 404.1520. The claimant has the burden of proof for the first four steps of the analysis, but the burden shifts to the Commissioner for the fifth step. *See Talavera*, 697 F.3d at 151.

## DISCUSSION

### I. The ALJ Properly Followed the Five-Step Analysis

First, the ALJ determined that Torregrosa had not engaged in substantial gainful activity since his December 20, 2011 onset date, and, thus, satisfied step one. (Admin. R. at 45.)

Second, the ALJ found that Torregrosa's obesity, diabetes, shoulder dislocation, and status-post torn rotator cuff surgery satisfied the "severe impairment condition" of step two. (*Id.*)

Third, the ALJ found that Torregrosa's severe impairments did not meet the criteria of an impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 47.) The ALJ determined Torregrosa's residual functional capacity (RFC), which is the most he can do despite his impairments. Specifically, he found that Torregrosa had the RFC to perform light work, and he could frequently climb, balance, stoop, kneel, crouch, crawl, and occasionally reach in all directions. (*Id.*); *see* 20 C.F.R. § 404.1529.

Fourth, the ALJ concluded that Torregrosa had past relevant medium-skilled work as a truck driver (DOT. Code No. 292.353-010). (*Id.* at 49.) However, the ALJ found that Torregrosa can no longer perform that past work. (*Id.*)

Fifth, the ALJ considered Torregrosa's age, education, RFC, and the vocational expert's testimony, and found that there were jobs that existed in significant numbers in the national economy that he could perform despite his impairments. (*Id.* at 50.) Accordingly, the ALJ found that the Commissioner had carried her statutory burden. (*Id.* at 51.)

## II. Substantial Evidence Supports the ALJ's RFC Determination[8]

The responsibility for determining a petitioner's RFC rests solely with the ALJ. *See* 20 C.F.R. §§ 404.1527(e)(2), 404.1546. In determining the RFC, the ALJ must consider all medical opinions together with other relevant evidence. 20 C.F.R. § 404.1527. Through this process, it is for the ALJ to resolve genuine conflicts in the evidence. *Veino v. Barnhart*, 312 F.3d 578, 588

---

[8] In addition to the record developed before the ALJ at trial, Torregrosa submitted medical evidence directly to the Appeals Council. Where a claimant submits additional evidence to the Appeals Council, in order for that evidence to have any bearing on the Council's decision, it must be "(1) new and not merely cumulative of what is already in the record, and that it is (2) material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative." *Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir. 1988) (internal citations and quotation marks omitted). Here, nothing in the evidence suggests – nor does Torregrosa argue – any change to the balance of the ALJ's RFC calculus. (*See generally* Pl. Mot.)

13

(2d Cir. 2002); *accord Schaal*, 134 F.3d at 504 ("It is for the SSA, and not this court, to weigh the conflicting evidence in the record."); 20 C.F.R. § 404.1527(c)(4). Here, the record contains substantial evidence through treatment notes, medical opinions, and vocational testimony to support the ALJ's RFC determination.[9]

In order to establish disability, the petitioner must show a medically demonstrable underlying physical or mental impairment, which could reasonably be expected to produce the alleged disabling symptoms. 20 C.F.R. § 404.1529(b); *accord Gallagher v. Schweiker*, 697 F.2d 82, 84 (2d Cir. 1983). In making Torregrosa's RFC determination, the ALJ gave greater weight to the opinion of Dr. Thukral, a consultative physician, than the opinion of Dr. Latt, an internist. With the exception of limited range of motion in his surgically-repaired right shoulder, Dr. Thukral found that Torregrosa had full muscle strength and range of motion, as well as normal reflexes and sensations throughout his arms and legs. (Admin. R. at 220–21.) Torregrosa's lumbar, thoracic, and cervical spine each demonstrated full range of motion. (*Id.* at 220.) His hand and finger dexterity were intact and demonstrated full bilateral grip strength. (*Id.* at 221.)

---

[9] Torregrosa argues that the ALJ failed to fully develop the medical record in making his RFC determination. *See* (Pl.'s Mem. at 11–14); *LaMay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508–509 (2d Cir. 2004) ("[The Social Security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record . . ."); *Butts v. Barnhart*, 388 F.3d 377, 386 (2d Cir. 2004) ("[I]t is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits."). Torregrosa asserts that the ALJ breached this duty by failing to contact the physicians who treated Torregrosa at the Wycoff Heights Medical Center to corroborate the extent of his impairments. (Pl. Mot. at 12.) However, "[w]hile the ALJ must supplement the record through his own initiatives when the record is incomplete or inadequate, this burden does not attach when the record is ample." *Valoy v. Barnhart*, 02-CV-8955 (HB), 2004 WL 439424, at *7 (S.D.N.Y. Mar. 9, 2004); *accord Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. N.Y. 1996) (finding that the ALJ need not seek out additional medical information where there is no indication in the record that the relevant medical evidence is inconclusive); *Lowry v. Astrue*, 474 Fed. Appx. 801, 804 (2d Cir. N.Y. 2012) ("Although an ALJ has an affirmative duty to develop the administrative record even when a claimant is represented by counsel 'where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.'") (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999). Here, as evidenced in part by the ALJ's robust comparison of the medical evidence offered by Torregrosa's internist and the consultative physician, it is clear that the "record contained sufficient evidence to make a disability determination, and the ALJ was under no obligation to seek additional treatment records. Therefore, the ALJ properly satisfied his duty to develop the record." *Martinez-Paulino v. Astrue*, 11-CV-5485 (RPP), 2012 WL 3564140, at *14 (S.D.N.Y. Aug. 20, 2012).

Dr. Thukral found that Torregrosa had no limitations in sitting or standing, and only moderate limitations for pulling, pushing, lifting, carrying, and other related activities. (*Id.* at 221.) In contrast, Dr. Latt opined that Torregrosa was limited to less than a full range of sedentary work, and could lift no more than ten pounds. (*Id.* at 49; 256.)

In light of the ample support in the record, the ALJ properly found that the balance of evidence contradicted Dr. Latt's opinion. (*Id.*) For example, Dr. Mitgang, a state agency medical consultant, assessed that Torregrosa was not limited to sedentary work.[10] (*Id.* at 230.) In addition, Torregrosa himself stated that he could lift more than ten pounds. (*Id.* at 24.) Thus, the record support's the ALJ's decision to credit the testimony of Dr. Thukral over Dr. Latt with respect to Torregrosa's ability to lift over ten pounds and perform more than sedentary work.[11] *See Veino*, 312 F.3d at 588; *Schaal*, 134 F.3d at 504.

### III. The ALJ Correctly Assessed Torregrosa's Credibility

A credibility finding by an ALJ is entitled to deference by a reviewing court "because [the ALJ] heard plaintiff's testimony and observed [plaintiff's] demeanor." *Gernavage v. Shalala*, 882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995). The ALJ must analyze the credibility of a claimant as to his symptoms through a two-step test. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). The ALJ must first decide "whether the claimant suffers from a medically determinable

---

[10] Sedentary work involves lifting up to ten pounds at a time, as well as occasional standing and walking. 20 C.F.R.§ 404.1567(a).

[11] Under the "treating physician rule" an ALJ should generally "give more weight to opinions from treating sources . . . ." 20 C.F.R. § 404.1527(c)(2). Here, Torregrosa makes only passing mention of this rule to argue that the ALJ did not fulfill his duty to independently develop the record. (*See* Pl.'s Mot. at 13–14); *see also* FN 9, *supra*. Torregrosa does not argue that the treating physician rule required the ALJ to weigh the evidence in any particular way. (*See generally* Pl.'s Mot.) In any case, when a treating physician's opinion is unsupported, or when it is inconsistent with other substantial evidence, the ALJ is not required to afford deference to that opinion and may use his discretion in weighing the medical evidence as a whole. *See Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). In the instant case, the ALJ weighed "the evidence as a whole" and properly found more support in the record for Dr. Thukral's medical opinion than Dr. Latt's. *Id.*; (Admin. R. at 220–21, 256.)

impairment that could reasonably be expected to produce the symptoms alleged." *Id.* (citing 20 C.F.R. § 404.1529(b)). Next, if the ALJ determines that the claimant does have such an impairment, he must consider "'the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record." *Id.* (quoting 20 C.F.R. § 404.1529(a) (alterations omitted)). When evaluating the "intensity, persistence and limiting effects of symptoms, the Commissioner's regulations require consideration of seven specific, *objective* factors . . . that naturally support or impugn *subjective* testimony of disabling pain and other symptoms." *Dillingham v. Colvin*, No. 14-CV-105 (ESH), 2015 WL 1013812, at *5 (N.D.N.Y. Mar. 6, 2015). These seven objective factors are:

> (i) [the] claimant's daily activities; (ii) [the] location, duration[,] frequency, and intensity of [the] claimant's pain or other symptoms; (iii) precipitating and aggravating factors; (iv) [the] type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate [the claimant's] pain or other symptoms; (v) treatment, other than medication, [the] claimant receives or has received for relief of her pain or other symptoms; (vi) measures [the] claimant uses or has used to relieve pain or other symptoms; and (vii) other factors concerning [the] claimant's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *5 n.22 (citing 20 C.F.R. §§ 404.1529(c), 416.929(c)). "While it is 'not sufficient for the ALJ to make a single, conclusory statement that' the claimant is not credible or simply recite the relevant factors, remand is not required where 'the evidence of record permits [the Court] to glean the rationale of the ALJ's [credibility] decision.'" *Cichocki v. Astrue*, 534 F. App'x. 71, 76 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)). In such a case, "the ALJ's failure to discuss those factors not relevant to [her] credibility determination does not require remand." *Id.*

Here, the ALJ followed the two-step process in considering Torregrosa's symptoms. (Admin. R. at 48–49.) First, the ALJ found that Torregrosa suffers from a medically cognizable

16

impairment. (*Id.*) However, at step two, the ALJ found that Torregrosa was not entirely credible with respect to his symptoms. (*Id.*) The ALJ compared Torregrosa's testimony regarding his pain, strength, and range of motion to the medical evidence and found that Torregrosa's testimony was not entirely credible. (*Id.* at 47–49.) In doing so, the ALJ considered Torregrosa's ability to perform daily activities. (*Id.*); 20 C.F.R. § 404.1529(c); *Poupore*, 566 F.3d at 307. Torregrosa testified that he showered, bathed, dressed himself, cooked, cleaned, did laundry, went for walks, used public transportation, shopped for groceries, performed childcare, and socialized. (Admin. R. at 136–41, 219.) The ALJ found that this testimony corroborated Dr. Thukral's range of motion assessment. Specifically, the ALJ noted that Dr. Thukral found Torregrosa exhibited a full range of motion throughout his back, neck, arms, and legs. (*Id.* at 220–21.)

The ALJ found that the objective medical evidence outweighed Torregrosa's subjective pain and range of motion complaints. (*Id.* at 49); *see Veino*, 312 F.3d at 588. As such, the extensive medical record provides substantial evidence in support of the ALJ's credibility and RFC determinations. *See Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) ("In our review, we defer to the Commissioner's resolution of conflicting evidence.").

### IV. Substantial Evidence Supports the ALJ's Finding That Torregrosa Was Capable of Performing a Significant Number of Jobs in the National Economy

At step five of the disability analysis, the ALJ must consult the applicable Medical Vocational Guidelines found at 20 C.F.R. Part 404, Subpart P, Appendix 2. *See Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986). However, where, as here, a claimant has both exertional and nonexertional impairments, the ALJ is entitled to rely on the opinion of a vocational expert. *See Dumas v. Schweiker*, 712 F.2d 1545, 1553–54 (2d Cir. 1983). An ALJ may rely on a vocational

expert to determine whether there is work that exists in significant numbers in the national economy that a claimant could perform, given his vocational factors and RFC. *Id.*

After a battery of hypothetical questions, VE Christina Boardman testified that Torregrosa could at least work as an usher (DOT Code No. 344.677-014) with an estimated 106,860 jobs in the national economy, or a counter clerk (DOT Code No. 249.366-010) with an estimated 432,650 jobs in the national economy. (Admin. R. at 32.)[12] Based on that testimony, the ALJ concluded that Torregrosa was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (*Id.* at 51.) That Torregrosa could perform available jobs provides sufficient evidence that "a reasonable mind might accept as adequate to support" the ALJ's determination. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (internal quotation marks omitted). As such, the ALJ's conclusion that Torregrosa was not entitled to DIB is supported by substantial evidence in the record.

## CONCLUSION

For the reasons stated herein, Torregrosa's motion for judgment on the pleadings (Doc. No. 17) is denied, and the Commissioner's motion for judgment on the pleadings (Doc. No. 15) is granted.

The Clerk of Court is respectfully directed to enter judgment accordingly and close the case.

---

[12] Plaintiff argues that the ALJ's hypothetical questions to the VE failed to accurately capture Torregrosa's physical limitations because they failed to include "any visual difficulties the Plaintiff had as noted by Dr. Thukral." (Pl. Mot. at 15) (citing (Admin. R. at 221).) However, Dr. Thukral merely diagnosed Torregrosa with "decreased visual acuity in both eyes due to diabetic retinopathy, by history." (Admin. R. at 221.) In fact, Dr. Thukral assessed Torregrosa's vision at "20/20 on a Snellen chart at 20 feet," uncorrected. (*Id.* at 219.) It is not clear how a hypothetical claimant with 20/20 vision at 20 feet would be prevented from, for example, working as a counter clerk. (*Id.* at 32.) As such, failure to mention Torregrosa's visual acuity in hypothetical questions to the VE did not alter the balance of substantial evidence in support of the ALJ's RFC assessment.

18

SO ORDERED.

Dated: Brooklyn, New York
       March 17, 2017

                                    s/Roslynn R. Mauskopf
                                    _____
                                    ROSLYNN R. MAUSKOPF
                                    United States District Judge